JUDGE STANTON

08 CV 1602

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BAYTREE CAPITAL ASSOCIATES, LLC,
derivatively on behalf of,
BROADCASTER, INC.

                    Plaintiff,

       - against -

NOLAN QUAN, MARTIN R. WADE III,
BLAIR MILLS, RICHARD BERMAN,
ANDREW GARRONI, JASON BRAZELL,
ROBERT GOULD, SANGER ROBINSON,
ALCHEMY COMMUNICATIONS, INC.,
FROSTHAM MARKETING, INC., PACIFICON
INTERNATIONAL, INC., LONGVIEW MEDIA,
INC., ACCESS MEDIA NETWORKS, INC.,
ALCHEMY F/X, INC., INNOVATIVE NETWORKS,
INC., BINARY SOURCE, INC., BROADCASTER,
LLC, TRANSGLOBAL MEDIA, LLC, SOFTWARE
PEOPLE, LLC, and ACCESS MEDIA
TECHNOLOGIES, LLC,

                  Defendants.

      - and-

BROADCASTER, INC.

               Nominal Defendant.
-------------------------------------------------------------------X

**VERIFIED
SHAREHOLDER
DERIVATIVE COMPLAINT**

Case No.:

FEB 15 2008

U.S.D.C. S.D.N.Y.
CASHIERS

      Plaintiff BAYTREE CAPITAL ASSOCIATES, LLC ("Baytree"), by and through their

attorneys, derivatively on behalf of Broadcaster, Inc., alleges upon personal knowledge as to

itself and its own acts, and as to all other matters upon information and belief based upon, inter

alia, the investigation made by and through their attorneys, as follows:

## SUMMARY OF THE ALLEGATIONS

     1.    Plaintiff, derivatively on behalf of nominal defendant Broadcaster, Inc.

("Broadcaster" or the "Company"), seeks relief for the damages sustained, and to be sustained,

by Broadcaster against Defendants, certain executives and a majority of its Board of Directors, as well as related companies and individuals, for violations of state and federal law, including pilfering and looting of the Company's funds, breaches of fiduciary duties, fraud and fraudulently obtaining assets and funds of the Company, misappropriation of the assets and funds of the Company, gross mismanagement, waste of corporate assets, self-dealing, unjust enrichment, conversion, laundering of the income and funds of the Company through other entities and violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

2.       Further, Plaintiff, derivatively on behalf of nominal defendant Broadcaster, Inc. seeks relief for the damages sustained, and to be sustained, by Broadcaster against defendants for violations of the Federal Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO").

## PARTIES

The Plaintiff

3.       Plaintiff Baytree Capital Associates, LLC ("Baytree") is a Delaware limited liability company with its principal executive offices located at The Trump Building at 40 Wall Street, New York, NY 10005 and is now, and at all relevant times has been, a shareholder of the Company.

4.       As a current holder of common stock in the Company, and as a holder of common stock at all times relevant to the claims alleged herein, and pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, Plaintiff has standing to assert these claims on behalf of the Company and will fairly and adequately protect the interests of the Company and its other shareholders.

The Defendants

5.        Defendant Nolan Quan ("Quan") is, and at all relevant times has been, the largest shareholder of Broadcaster, and for much of the relevant time period as described herein was President and Chief Operating Officer of the Company.  Upon information and belief, Quan is a citizen of California.

6.        Defendant Martin Wade ("Wade") is, and at all relevant times has been, serving as Chief Executive Officer of the Company and Chairman of its Board of Directors (the "Board").  Upon information and belief, Wade is a citizen of New Jersey.

7.        Defendant Blair Mills ("Mills") is, and all relevant times has been, serving as Chief Financial Officer of the Company and as a Director.  Upon information and belief, Mills is a citizen of California.

8.        Defendant Richard Berman ("Berman") is, and at all relevant times has been, serving as a Director of the Company and serves as Chairman of the Audit Committee for the Company.  Upon information and belief, Berman is a citizen of Connecticut.  (Wade, Mills and Berman are jointly referred to herein as the "Board Defendants").

9.        Andrew Garroni ("Garroni") is, an individual residing at 8646 Edwin Drive, Los Angeles, California, and is, upon information and belief, an employee of Broadcaster, and was appointed by the Company, during all relevant times herein, as the Shareholder Representative of Broadcaster. Garroni also served at all relevant times herein as the President of Pacificon International, Inc., Binary Source Inc. and Chief Executive Officer and President of Longview Media, Inc., and has a significant interest and participation in Frostham Marketing, Inc. Gorroni has participated in numerous business ventures with defendant Quan. Garroni is a citizen of California.

10.    Jason Brazell ("Brazell") was, upon information and belief, until recently an
employee of Broadcaster, Inc., and is, Chief Executive Officer and President of Frostham
Marketing, Inc. Upon information and belief, Brazell is a citizen of California.

11.    Rob Gould ("Gould") is, upon information and belief, an employee of
Broadcaster, Inc., as well as Vice President of BIG, Inc., and has participated in numerous
business ventures with defendant Quan. Upon information and belief, Gould is a citizen of
California.

12.    Sanger Robinson ("Robinson") is, upon information and belief, an employee of
Broadcaster and is President of, and listed as the agent for service of process for, Broadcaster
Interactive Group, Inc., with a listed business address of 9201 Oakdale Avenue, Chatsworth,
California, the same address as Broadcaster, Inc. Upon information and belief, Robinson is a
citizen of California.

13.    Alchemy Communications, Inc. ("Alchemy") is a California corporation with its
principal place of business at 1200 West 7th Street, Box No. L1-100, Los Angeles, California.

14.    Frostham Marketing, Inc. ("Frostham") is a Florida corporation with a registered
address with the California Secretary of State of 8646 Edwin Drive, Los Angeles, California (the
home address of Defendant Garroni) and transacts business at 9201 Oakdale Avenue,
Chatsworth, California 91311 (the corporate address of Broadcaster), and utilized 3940 Laurel
Canyon Boulevard, Box No. 609, Studio City, California 91604 (a postal box also utilized by
defendant Pacificon).

15.    Pacificon International, Inc. ("Pacificon") is a California corporation with its
principal place of business at 3940 Laurel Canyon Boulevard, Box No. 609, Studio City,

California 91604 (a postal box also utilized by defendant Frostham). At all relevant times Garroni was its President.

16.     Longview Media, Inc. ("Longview") is a California corporation with its principal place of business at 9201 Oakdale Avenue, No. 201, Chatsworth, California 91311 (the corporate address of Broadcaster).

17.     Access Media Networks, Inc. ("AccessMedia") is a Delaware corporation with a registered address with the California Secretary of State of 8646 Edwin Drive, Los Angeles, California (the home address of Defendant Garroni) and transacts business at 9201 Oakdale Avenue, Chatsworth, California 91311 (the corporate address of Broadcaster).

18.     Alchemy F/X, Inc. ("Alchemy F/X") is a California corporation with its principal place of business at 1200 West 7th Street, Box No. L1-100, Los Angeles, California 90017 (the same business address as Alchemy Communications, Inc.).

19.     Innovative Networks, Inc. ("Innovative") is a California corporation with its principal place of business at 20841 Venture Boulevard, Box No. 357, Woodland Hills, California 91364.

20.     Binary Source, Inc. ("Binary") is a California corporation with its principal place of business at 4804 Laurel Canyon Boulevard, No. 536, Valley Village, California 91607.

21.     Broadcaster, LLC is a Nevada corporation with its principal place of business at 3540 W. Sahara Ave. #763, Las Vegas, NV 89102, and maintains an 18.8% ownership interest in Broadcaster and is a company owned and controlled by Defendant Quan.

22.     Transglobal Media, LLC ("Transglobal") is a Wyoming corporation with its principal place of business at 2710 Thomes Ave. Cheyenne WY 82001, and maintains an 10%

ownership interest in Broadcaster, Inc. and is a company owned and controlled by Defendant Quan.

23.     Software People, LLC ("Software") is a Wyoming corporation with its principal place of business at 109 E. 17th Street #25, Cheyenne, WY 82001, and maintains a 10% ownership interest in Broadcaster and is a company owned and controlled by Defendant Quan.

24.     Access Media Technologies, LLC, ("Access Media Tech.") is a Wyoming, corporation with its principal place of business at 123 West First Street #675, Casper, WY 82601, and maintains a substantial ownership interest in Broadcaster, Inc. and is a company owned and controlled by Defendant Quan.

Nominal Defendant

25.     Broadcaster, Inc. is a Delaware corporation with its principal executive offices at 9201 Oakdale Ave. Suite 200, Chatsworth, CA 91311. The Company's securities are publicly traded on the Over the Counter Bulletin Board ("OTCBB") under the symbol "BCAS". According to the Company's public filings, Broadcaster is a social video networking website, broadcaster.com, providing users the ability to directly communicate through video over the internet using webcams and to produce and post videos for the public. According to its most recent Securities and Exchange Commission ("SEC") form 8K filing the company is terminating all but five of its employees and is investigating new business opportunities.

## JURISDICTION

26.     This Court also has original subject matter jurisdiction over plaintiffs' claims under 18 U.S.C. 1964, 15 U.S.C. § 78j(b) (Exchange Act §10(b)) and 17 C.F.R. § 240.10b-5 (SEC Rule 10b-5) pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiffs' remaining claims pursuant to 28 U.S.C. § 1367.

27.    This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the Plaintiff and Defendants are citizens of different States. This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to the claim occurred here and Section 27 of the Exchange Act, 15 U.S.C. §78aa, because acts and transactions constituting the violations complained of occurred here.

## PRELIMINARY STATEMENT

29.    This action is brought as a result of Defendants' truly blatant, extreme and reprehensible pilfering and looting of Broadcaster, a small company, in an amount often in excess of $1,000,000 a month through various means and devices. This looting and corporate theft has occurred for more than a year and a half and resulted in approximately $22,630,000 in losses to the Company. With no legitimate business or plan the company in fiscal year ending June 2007, lost approximately $16,000,000 primarily through payments to companies controlled by Quan, the Board Defendants and other named Defendants for artificial services. Much of these looted funds were derived through improper or unlawful business practices while other funds were derived from the prior sale of software assets. At the same time, Defendant Quan fraudulently obtained an additional seven million shares of voting common stock allowing him to take control of the Company as its major and almost majority shareholder. Since receiving these additional shares Quan has installed two new interested and non-independent board members chosen by him to replace the only two independent board members, Vincent F.

Orza, Jr. and Paul Goodman.

## OBLIGATIONS AND DUTIES OF THE DEFENDANTS

30.    By reason of their positions as directors, Defendants Wade, Mills and Berman as well as the officers, and/or fiduciaries of the Company and because of their ability to control the business corporate and financial affairs of the Company, owed the Company and its shareholders the fiduciary obligations of good faith, candor, the duty to exercise due care in the management and administration of the affairs of the Company and preservation of its assets, and the duty of loyalty, to put the interests of the Company above their own financial interests.  Additionally, the defendants owed a duty to the Company and its shareholders to operate the Company in compliance with all applicable federal and state laws, rules, and regulations, and to ensure that the Company not engage in any unsafe, unsound, or illegal business practices.

31.    To discharge their duties, the Board Defendants and other named defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and affairs of the Company and to act only in the best interests of the corporation and not engage in self dealing.  By virtue of such duties, the Board Defendants and other named defendants were required, among other things, to:

    a)  exercise good faith in ensuring that the affairs of the Company are conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of the business;

    b)  manage, conduct, supervise, and direct the employees, business and affairs of the Company in good faith, in a diligent, honest and prudent manner, and in accordance with all applicable laws, rules and regulations, and the charter and by-laws of the company;

    c)  remain informed as to how the Company was in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make a reasonable investigation in connection therewith and to take steps to correct that condition or practice, including, but not limited to, maintaining and implementing an adequate system of financial controls to gather and report

- 8 -

information internally, to allow directors to perform their oversight function properly to prevent to the use of corporate assets, property, funds, or non-public information for personal profit;

d) neither violate nor knowingly or recklessly permit any officer, director or employee of the Company to violate applicable laws, rules, or regulations, and to exercise reasonable supervision over such officers, directors, and employees;

e) refrain from acting to benefit themselves at the expense and to the detriment of the Company;

f) supervise the preparation, filing, and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by the Company, and to examine and evaluate any reports of examinations or investigations concerning the practices, dealings, or conduct of the officers, directors, and employees of the Company, and to make full and accurate disclosure of all material facts, concerning, inter alia, each of the subjects and duties set forth above; and

g) preserve and enhance the Company's reputation as befits a public corporation and to maintain public trust and confidence in the Company as a prudently managed institution fully capable of meeting its duties and obligations.

32.    The conduct of the Board Defendants and other named defendants complained of herein involves knowing violations of their duties as officers, directors, and fiduciaries of the Company and the absence of good faith on their part, which the Board Defendants and other named defendants were aware, or should have been aware, posed a risk of serious injury to the company.

33.    Board Defendants and other named defendants breached their duties of loyalty, due care, candor and/or good faith by themselves engaging, or allowing Board Defendants and other named defendants to engage, in self dealing, in the wasting of corporate assets, and in a fraudulent scheme to deplete the Company's assets; by themselves causing, or allowing Board Defendants and other named defendants to cause, the pilfering of the Company assets and the misrepresentation of its financial position and dealings; and by themselves violating, or allowing

defendants to violate, applicable state and federal laws, rules, and regulations including, inter

alia, Section 10(b) of the Exchange Act and SEC Rule 10b-5.

### FACTS COMMON TO ALL CLAIMS

34.    Broadcaster is a publicly traded company, currently trading on the Over the

Counter Bulletin Board ("OTCBB") under the symbol "BCAS". Broadcaster was previously a

microcomputer software company known as "International Microcomputer Software" ("IMSI").

In 2005 and 2006, when still IMSI and then again when Broadcaster, the Company sold off

certain software publishing subsidiaries to third party entities and sought new business

opportunities for the Company.

35.    On or about June 2, 2006, IMSI acquired a company known as AccessMedia, a

company controlled through various entities owned by Quan and others. The company's name

was then changed to Broadcaster, with Quan as its largest shareholder. At the time of the

acquisition, in 2006, AccessMedia claimed to be, and to some extent was, in the business of

selling Internet-based content through a software based "virtual set top box" which, on a

subscription basis, would allow users to access and watch a variety of content including news,

sports, movies and adult content.

36.    In August 2006, the Federal Trade Commission ("FTC") filed a complaint against

AccessMedia and numerous other entities (FTC Complaint, Case No. 06-4923) ("FTC

Complaint"). Among those named in the FTC Complaint were Defendants Alchemy,

Accessmedia, Pacificon, Frostham, Longview, Innovative, Binary and Garroni, ("FTC

Defendants"). The FTC Complaint alleged that the said Defendants acted as a "common

enterprise" to engage in a nationwide scheme to use deception and coercion to extract payments

from consumers (FTC Complaint, pg. 8, Case No. 06-4923). The FTC Complaint included

claims that the FTC Defendants, along with others, downloaded pernicious adware or spyware ("Malware") onto consumers' computers which Malware repeatedly pelted the consumer's computer with pop-up messages, accompanied by music that lasted nearly a minute, and could not be closed or minimized. These pop-up messages demanded that consumers pay the Defendants a minimum $29.95 fee to end the recurring pop-up cycle. The pop-up messages claimed that consumers had signed up for a three-day "free-trial" of the Defendants' Movieland Internet download services and did not cancel their membership before the trial period was over, thus obligating them to make payment. The only way a consumer could regain control of their computer was to pay the Defendants to stop the pop-up messages or pay a computer technician to assist them as the imbedded program was very difficult to uninstall ("Subscriber Scheme"). The FTC charged that this Subscriber Scheme was unfair and deceptive and violated federal law.

37.    The FTC Complaint alleged that Alchemy, Accessmedia, Pacificon, Frostham, Longview, Innovative, Binary and others operated the Subscribers Scheme as a common enterprise throughout the United States. The FTC Complaint was resolved by way of an agreement entitled "Settlement Agreement and Stipulated Final Order for Permanent Injunction and Monetary Relief" executed by the all of the defendants named in that action in June of 2007. It required, inter alia, certain injunctive relief on business practices, reporting and a monetary payment of $501,367. Although Broadcaster was not a named defendant in the FTC Complaint, the Company paid the entire monetary amount of the settlement and paid for all legal fees and expenses for the defendants in that action including the FTC Defendants and Garroni's individual and separate counsel.

38.    Because of the filing and formal settlement of the FTC Complaint, the FTC Defendants could no longer operate the Subscribers Scheme. Therefore, in December 2006, the

Board of Directors voted to change the Company's business model for the website, now known as "broadcaster.com". The Company claimed to have abandoned the concept of the distribution of Malware under the guise of subscription-based access to media content. In its stead, the Company claimed to have created a social video networking site, which would attempt to generate revenue through the sale of advertisements on the webpages. The Company claimed that it spent large sums of money to advertise its website on the internet. The Company's 2007 SEC form 10KSB statement provides that "During the fiscal year ended June 30, 2007, we spent approximately $6,288,000 on Internet advertising on other websites seeking to encourage persons to visit our website." p.6.  In addition to spending over six million dollars on this alleged advertising campaign, the Company paid approximately $9,000,000 to alleged third-parties to generate "traffic" to the Company's website.

39.    In fact, the new "business plan" orchestrated, executed and operated by the Board Defendants was a fraudulent scheme to justify the expenditure of millions of dollars to certain Defendants or other related companies and individuals. First, the alleged advertising campaign did not exist.  The $6,288,000 consisted of payments to Defendants or related third parties controlled by Defendants disguised as internet advertising payments.

40.    Next, there was also little, or no, legitimate "traffic" generation to the Company's website. The approximate $9,000,000 spent on "traffic" generation was simply improper looting payments to certain Defendants.  The Defendants, caused the Company to pay approximately $7,000,000 to Defendant Frostham, and another estimated $2,000,000 to Defendant Longview, under the guise that the two said defendants had created, or would create, "traffic" for broadcaster.com. In fact, Defendants Frostham and Longview provided no services to justify these payments. Although Defendants Frostham and Longview did nothing, another company,

Defendant Alchemy did do something. Defendant Alchemy, with the assistance of, and at the direction of, the other Defendants, reprogrammed and/or reutilized the Malware previously improperly imbedded on computers during the Subscriber Scheme, and otherwise utilized Malware, to cause a large number of computers to involuntarily visit the broadcaster.com site. Instead of opening a pop-up which demanded payment from the free three-day trial of the Company's service, a pop-up window opened directly to the Company website, Broadcaster.com. This pop-up was then registered as a "hit" or "unique visitor" on the website server creating the false impression that a consumer had visited the site. In fact, the consumer had not desired to visit the site and in most cases immediately closed the pop-up window, ("Unique Visitor Scheme"). While Alchemy's servers were used for this scheme, Frostham and Longview provided no services for these payments at all, not even the illegitimate service. Frostham and Longview did nothing, other than act as a vehicle for Quan's, as well as the other Defendants' theft of Company funds.

41. The Unique Visitor Scheme was so successful, and so many "phantom page views" were recorded, that rumors spread on the internet that Broadcaster.com was not a web site but in fact was a virus infecting people's computers.

42. Further, based upon these results for unique visitors, which Quan and the Defendants knew to be false, Quan, the Board Defendants and other employees and officers of Broadcaster caused the employees of the Company to issue press releases proudly announcing that these were legitimate "unique visitors" or "hits" and that Broadcaster.com had become one of the most popular sites on the web.

43. Although these phantom views were of no legitimate use to the Company, they were of great value to Defendant Quan. The Unique Visitor Scheme allowed the Defendants to

hide that payments were made for traffic generation that never occurred and benefited Quan further individually as it directly resulted in the issuance of millions of additional shares to him, or to companies owned by him. Quan's original compensation agreement called for him to earn millions of additional shares of common stock (the "Earn Out Shares") upon the Company reaching certain revenue and earnings levels. However, on January 4, 2007, by way of the Board Defendants, controlled by Defendant Quan, the Company altered his compensation package. The new compensation package for Defendant Quan equated each unique visitor with one dollar of earnings, so that when the Company reached certain unique visitor levels, rather than earnings levels, pursuant to the Unique Visitor Scheme, Defendant Quan was issued millions of additional shares of stock. These additional shares provided Defendant Quan with an almost majority position and ever greater control of the Company.

44.    Quan and the Defendants also utilized the Unique Visitor Scheme to egregiously, blatantly and systematically loot and pilfer the Company of its assets. As part of the Unique Visitor Scheme, the Defendants caused approximately $9,000,000 to be paid to Defendants Frostham and Longview, and possibly others, to produce phantom "traffic" which provided a fabricated reason for the payment to these entities.

45.    As herein discussed, Broadcaster and the defendant companies are controlled by Quan and other individual Defendants loyal to and working in connection with Quan. This scheme allowed Quan to both pilfer additional funds from the Company and obtain his Earn Out Shares.

46.    Despite the fact that Frostham was never listed as a related company in any Securities and Exchange Commission ("SEC") filing, the nexus between Frostham and Quan is

clearly established by the fact that, according the FTC, the addresses used by Frostham are as follows:

     i.     9201 Oakdale Avenue, Chatsworth, CA – This is Broadcaster's current address.

     ii.     8646 Edwin Drive, Los Angeles, CA – This is Defendant Andrew Garroni's home address, an employee of the Company, the Company's Shareholder Representative, and a long time business associate of Quan.

     iii.     3940 Laurel Canyon Drive, Studio City, CA #191 and #609 – These are mail drop boxes. There are no offices located at these addresses.

47.     Further, Frostham has no web site, no phone number listed anywhere in the United States and no address listed other than those related to the Company and Defendant Garroni's home. In addition, the June 2007 Settlement Agreement with the FTC was signed by Frostham's President, Jason Brazell. Defendant Brazell was an employee of Broadcaster at the time he was acting as the President of Frostham.

48.     As described previously, although Frostham was paid approximately $7,000,000 for producing internet "traffic" for Broadcaster.com, the truth is that Frostham did nothing to earn the money. Thus, $7,000,000 was simply stolen from the Company by Quan, the Board Defendants and other named Defendants by transferring the money to Frostham, an entity controlled by Quan, Garroni, Brazell and the Defendants, all the while failing to disclose the nature of the connection between the Company and Frostham.

49.     In addition to Frostham, funds were paid to Longview for the same internet traffic for which Frostham received funds. Defendant Longview is a company owned and/or controlled

by Defendant Quan. The relationship between Quan and Longview is established by the fact that, according to the FTC, the addresses used by Longview Media are as follows:

      i.  6300 Canoga Avenue, 15th Floor, Woodland Hills, CA – This is Access Media's former address.

      ii.  9201 Oakdale Avenue, Chatsworth, CA – This is Broadcaster's current address.

50.    Further, Defendant Mills is the Chief Financial Officer and a Director of Broadcaster, while still holding his position as CFO of Longview.

51.    In addition, Quan's biography on the Company web site provides that "Mr. Quan co-founded a series of successful Internet related companies…These companies include Alchemy Communication, Inc…Longview Media, Inc...NetBroadcaster, Inc…and Access Media, Inc."

52.    Longview has no web site, no phone number listed anywhere in the United States and no listed address other than the Company's offices. In June, 2007, Defendant Longview also executed the Settlement Agreement with the FTC. On behalf of Longview, the agreement was signed by Andrew Garroni as President. Again, Defendant Garroni is an employee of Broadcaster, is its Shareholder Representative, and his home address is listed as a business address for Frostham, the other company receiving funds for allegedly producing internet traffic.

53.    In addition to the payments made for "traffic", during the fiscal year 2007, the Company paid approximately $1,837,000 in so called "processing fees" for credit cards. These fees were paid to Pacificon. Pacificon, according to the FTC Complaint, transacts business at the exact same mail box drop utilized by Frostham; 3940 Laurel Canyon Drive, Studio City, CA, #609. Further, the FTC Settlement Agreement was signed on behalf of Pacificon by Defendant

Garroni as its President, as discussed Garroni was the Shareholder Representative of Broadcaster and an employee of Broadcaster. The fees charged by Pacificon for credit card processing are approximately 26.5% of the payments made to the Company, far in excess of the industry standard and an unquestionably unreasonable sum.

54.    Further, the FTC Complaint noted that, in addition to Pacificon, another company, Defendant Binary, received payments from subscribers. Like Pacificon, Binary retained large percentages of the Company's funds, allegedly as a processing fee. Just as with Frostham, Longview and Pacificon, Garroni's name is tied to Binary as its President and Chief Executive Officer.

55.    None of the relationships with Frostham, Longview, Pacificon or Binary were ever disclosed by the Company to the public or to the Company's auditors despite the fact that Quan, the Board Defendants and other named Defendants were clearly aware of the nature of these relationships.

56.    Alchemy, which is the only disclosed related defendant entity of Quan's, (other than Alchemy FX), in the SEC filings to receive payments from the Company, obtained payments that can only be viewed as self-dealing and looting. In fiscal year 2007 the Company paid Alchemy approximately $1,580,000 plus an additional $269,000 for office services and $105,000 in licensing fees. Quan, along with the Board Defendants and other named Defendants, caused these payments to be made by the Company for either no services at all or, to the extent services were provided, at an extremely highly inflated price for what limited services were performed. Likewise, Quan and the Defendant Board members paid improper license fees to defendants Alchemy FX, controlled by Quan and Gould, Broadcaster LLC, controlled by Quan, and individually to Quan, Robinson and Gould.

57.    Clearly, Quan and the other named Defendants, in collusion with each other in and outside of Broadcaster, formed an enterprise, an association-in-fact, separate and apart from the regular affairs of Broadcaster which conspired to and did engage in a pattern of racketeering activity, on more than two occasions, as further described herein.  Such activity and misrepresentations were undertaken with knowledge of its impropriety.  Quan, the Board Defendants, Garroni, Brazell, and the other named Defendants, and others yet to be specifically identified, each acting in collusion with the other, formed an enterprise (the "Enterprise"), an association-in-fact separate and apart from the regular affairs of Broadcaster, and conspired to and did engage in a pattern of racketeering activity by repeatedly defrauding Broadcaster, as further described herein; specifically,

    i.    Repeatedly pilfering, defrauding and looting Broadcaster by obtaining the funds of Broadcaster without providing any legitimate services in return.

    ii.    Providing fraudulent services by way of the Subscriber Scheme, which funds were then diverted and hidden in members of the Enterprise.

    iii.    Providing false and artificial "hits" or "unique visitors" by way of the Unique Visitor Scheme which resulted in millions of shares issued to Quan and his controlled entities providing Quan with an almost majority share position and control of Broadcaster.

## DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

58.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the injuries suffered, and to be suffered, as a direct result of the defendants' breaches of their fiduciary duties, improper acts and violations of federal and state laws, rules, and regulations alleged herein.  The company is named as a nominal defendant solely in a

derivative capacity.

59.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights.

60.     Plaintiff is and has continuously been an owner of the Company stock during the wrongful conduct alleged herein.

61.     Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.  Given the facts as alleged, Plaintiffs did not make a demand on the Board to bring this action because such demand would be a futile and useless act.

62.     During all relevant times stated herein, the Board has consisted of five (5) Directors. Three (3) of the Board Directors are named as defendants herein and are interested and not independent.  The Defendant members of the Board are: Mills, Wade and Berman. Paul Goodman and Vincent F. Orza, Jr. are also members of the board of directors and are not alleged herein to have engaged in the claimed wrongdoings.  Nor is it claimed that Directors Goodman and Orza are interested members.  Very recently two new members were elected to the Board, Arthur G. Camiolo and Lawrence Johnson. They were both sponsored entirely by Quan and Wade, and were proposed to be added to the Board on a moments notice at a recent Board meeting. Orza was not present at the meeting but Goodman objected, indicating that the necessary review of the proposal should be conducted.  In spite of Goodman's objection, the two new members were added.  Shortly before the addition of the new members, Goodman and Orza were voted to be removed from the Board. As the removal of Goodman and Orza is not yet effective, the Board currently consists of seven (7) members, five (5) of which are interested and not independent. When the removal of Goodman and Orza is complete, the Board will consist of five (5) entirely interested and not independent members. The purpose of appointing Camiolo

- 19 -

and Johnson to the Board was to rid the Board of the non-interested and independent members.
The Board is interested and under the control of Quan acting at his behest and in the interest of
Quan and the other defendants. As such, and as stated in more detail above and herein, a demand
to the Board would be a futile, wasteful, and a useless act for the following reasons:

a)  A majority of the directors on the Board are defendants herein, (or will be when
Goodman and Orza's removal is complete), and as such, are incapable, based upon
their acts as described herein, of independently and disinterestedly considering a
demand to commence and vigorously prosecute this action or seek other redress;

b)  All of the defendants participated in, approved, or through abdication of duty,
permitted the wrongs alleged herein to occur and participated in efforts to conceal or
disguise those wrongs from the Company stockholders. The defendants disregarded
the wrongs complained of herein, and therefore are not disinterested parties;

c)  The defendants' fraudulent schemes to divert corporate funds for their own use
were unlawful and not within the defendants' business judgment to authorize ratify or
facilitate;

d)  There was no legitimate basis for the payments to Frostham, Longview, Pacificon,
Binary or Alchemy, yet such payments were voted upon by the Board Defendants.
They were designed solely to benefit the defendants in a manner that was inconsistent
with the Company's by-laws, public disclosures and representations made to its
shareholders, and was to the detriment of the Company. Thus, the transactions
constituted a waste and looting of corporate assets and could not have been the
product of the proper exercise of business judgment;

e)  Despite Defendants' breaches of duty, the Board as a whole has not

recommended that any defendant be relieved of his or her duties as a director and/or officer of the Company other than the non-interested and independent board members. By maintaining the status quo in light of these breaches of duty, the Board majority failed to exercise proper business judgments and therefore lacks independence;

f) Furthermore, the Board did not require that the defendants immediately disgorge all of their improper gains from their illegal conduct and breaches of duty. Nor did they take any other action, including commencing legal proceedings to protect the interests of the Company; and

g) The Board was clearly aware of, and actually sanctioned and directed, the improper actions, corporate waste, self-dealing and outright looting of the Company.

63.    Defendants, each acting together and with others yet to be specifically identified, improperly converted and misappropriated approximately $22,630,000 from the Company in fiscal year 2007. Since then the Company has continued to improperly convert and misappropriate additional funds at an amount of approximately $1,000,000 a month. The Company currently has no, or almost no, revenue. An example of the looting of the Company's funds are the approximately $9,000,000 paid for internet traffic when no such services were provided. The Board Defendants are interested and not independent and their conduct is not the product of the valid exercise of business judgment.

## FIRST CAUSE OF ACTION

### AGAINST ALL DEEFNDANTS FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5: SEEKING DAMAGES

64.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

- 21 -

65.     Defendants, individually and jointly, carried out a plan, scheme and course of conduct which was intended to and did deceive the Company, the investing public, and the minority shareholders by fraudulently and deceptively misrepresenting the strength and value of the business in order to cause the company to issue certain shares to Quan.

66.     In furtherance of this unlawful scheme defendants, individually and jointly, did cause the Company to issue millions of securities as "Earn Out Shares" to Quan as compensation and in exchange for Quan's actions as President in seemingly increasing the popularity of the Company's website.  As alleged herein, the apparent increase was due to the defendants scheme of manufacturing unintentional or "phantom" page views to create the appearance of interest in the site when in fact there was very little or none.  The Company issued these shares as a direct result and in reliance on the defendants' untrue statements and/or omissions of material facts relating to the deceptive and manipulative practices in, inter alia, using adware or spyware to falsely increasing the number of "page views" or "unique visitors" received on the Company's website.  Thereby the defendants fraudulently misrepresented, to the Company, Quan's entitlement to the shares.

67.     Defendants, individually and in concert, directly and indirectly, through the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and its operations, future prospects, and true source of its claimed growth and popularity.

68.     Defendants advanced their unlawful scheme while in possession of adverse non-public information and engaged in acts and practices as alleged herein in an effort to insure investors, minority shareholders, and the Company itself of the value of the business and its substantial continued growth.  Defendants, by their deliberate omissions, misrepresentation, and

improper transaction, perpetrated a direct fraud upon the Company, its investors, and the minority shareholders in connection with the Company's issuance and exchange of its securities.

69.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein and/or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though available to them.  Such material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of concealing the true operating condition of the Company and the Company's future business prospects.

70.    As a direct result of the Defendants' omissions, misrepresentations, and deceptive practices, the Company was caused to issue millions of shares to Quan.  Thus, as a direct result of, and in reasonable reliance on, the Defendants' actions complained of herein, the Company was caused to exchange its shares for no actual value and was thereby damaged.

71.    By virtue of the Foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## SECOND CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5: SEEKING INJUNCTIVE RELIEF

72.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

73.    Defendants individually and jointly, carried out a plan, scheme and course of conduct which was intended to and did deceive the Company, the investing public, and the minority shareholders by fraudulently and deceptively manipulating the price of the Company's securities and by misrepresenting the strength and value of the business.

74.    In furtherance of this scheme, as described more fully above, defendants,

individually and jointly, did employ devices and artifices to defraud, made untrue statements of material facts and/or omitted to state material facts, and engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of the companies securities in an effort to maintain a unsupported and overvalued market price for the Company's securities.

75.    Defendants, individually and in concert, directly and indirectly, through the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and its operations, future prospects, and true source of its claimed growth and popularity, as well as to manipulate the price of its securities.

76.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein and/or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though available to them.  Such material misrepresentations and/or omissions were done intentionally and knowingly or recklessly for the purpose and effect of concealing the true operating condition of the Company and the Company's future business prospects and supporting the artificially inflated price of its securities.

77.    Defendants, individually and jointly did, and are continuing to, deplete the company of whatever value existed to the direct and continuing harm and detriment of the Company and its shareholders.  Through a plan, scheme, and improper course of conduct, defendants continue to rapidly drain the Company of its assets through improper transactions and payments to themselves individually and through shell companies, virtually eliminating all value left to the Company or its shareholders.

78.    Upon information and belief, defendants are now seeking to distribute what

- 24 -

remains of the Company and escape with their ill-gotten profits, such a course would involve distributing the remaining corporate funds to the defendants as well as engage in the fraudulent scheme of purchasing another company for the price of approximately all remaining Company funds, naturally the purchased entity will be chosen by, and controlled by, Quan and other of the defendants. Such a course would severely harm the remaining minority shareholders and the Company beyond repair.

79.    By virtue of the Foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants should be permanently enjoined from continuing in the conduct of artificially inflating the number of "hits" or "unique visitors" to the site or distributing assets of the Company to or among any of the defendants or any other related company or entity.

### THIRD CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

80.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

81.    The Board Defendants and other named defendants owe the Company fiduciary duties by reason of their fiduciary relationship. The Board Defendants and other named defendants owed and owe the Company the highest fiduciary obligations of good faith, candor, fair dealing, loyalty, and due care. Such obligations include, inter alia, the duties of supervision, oversight, reasonable inquiry, honesty and to refrain from self dealing.

82.    The Board Defendants and other named defendants, individually and jointly, breached their fiduciary duties of good faith, candor, fair dealing, loyalty, due care, supervision, oversight, reasonable inquiry, and to refrain from self dealing.

83.    Each of the Board Defendants and other named defendants caused, authorized, ratified, participated, aided and abetted, and/or permitted the wrongful conduct complained of herein. These actions were not a good faith exercise of prudent business judgment, and served only to damage the Company's corporate interests for the benefit of the defendants personally.

84.    As a direct and proximate result of the Board Defendants' and other named defendants' breaches of their fiduciary duties such, defendants have caused, and will continue to cause, the Company to suffer substantial monetary damages, as well as further continuing damage to the Company's reputation, business, and good will.

85.    The Company has been directly and substantially injured by reason of the defendants' intentional breach and/or reckless disregard for their fiduciary obligations to the Company. Plaintiff as a shareholder of the Company, in the right and for the benefit of the Company, seeks damages and other relief in an amount to be proven at trial but currently estimate the damages to be in excess of $22,630,000.

### FOURTH CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

86.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

87.    By engaging in the wrongdoing alleged herein, the defendants wasted corporate assets by, among other things, improperly authorizing illegal and improper transactions, which were of no benefit to the Company, failing to recover improperly secured profits, damaging the goodwill and reputation of the Company, and exposing the Company to civil and criminal liability, for which they are liable.

88.    As a direct and proximate result of the defendants actions, the company has

suffered damages in an amount to be proved at trial.

## FIFTH CAUSE OF ACTION

### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

89.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

90.     As a result of the fraudulent scheme to divert the Company's assets to their own personal accounts and to companies owned and/or controlled by them, and to use improper and deceptive practices to inflate the price of the Company's securities, the Defendants have been and will continue to be unjustly enriched at the expense of and to the detriment of the company.

91.     Accordingly, this Court should order the Defendants to disgorge all profits, benefits, and other compensation obtained by the defendants, jointly and individually, from their wrongful conduct, fiduciary breaches, and violations of the law described herein.

## SIXTH CAUSE OF ACTION

### AGAINST ALL DEFENDANT FOR CONVERSION OF CORPORATE ASSETS AND SELF-DEALING

92.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

93.     Quan and the other named defendants knew that no funds were owed by Broadcaster to Alchemy, Longview, Frostham, or any of the other named defendants.  However, despite this fact, Quan and the other named defendants, for their personal benefit, intentionally and fraudulently converted funds by transferring funds of Broadcaster to Alchemy, Longview, Frostham and the other named defendants for goods and services which were never provided and which they knew were never provided.

94.     In so acting, Quan and the other named defendants improperly converted the

assets of Broadcaster. Based upon this conversion, Plaintiff was damaged in an amount not as yet fully determined but believed to be in excess of $22,630,000.

## SEVENTH CAUSE OF ACTION

### AGAINST ALL DEFENDANT FOR RECEIVERSHIP

95.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

96.    By engaging in the wrongdoing alleged herein, the defendants wasted corporate assets by, among other things, improperly authorizing illegal and improper transactions, which were of no benefit to the Company, failing to recover improperly secured profits, damaging the goodwill and reputation of the Company, and exposing the Company to civil and criminal liability, for which they are liable.

97.    As a direct and proximate result of the defendants actions, the company has suffered damages and requests that the Court appoint a receiver to direct corporate functions and prevent any further harm, waste or injury to Plaintiff.

## EIGHTH CAUSE OF ACTION

### PURSUANT TO 18 U.S.C. SECTIONS 1962(a) AND 1964 (c) AS AGAINST ALL DEFENDANTS (FIRST RICO CAUSE OF ACTION)

98.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

99.    At all times relevant, Plaintiff, and the Enterprises were enterprises engaged in interstate commerce.

100.    Defendants unlawfully, willfully and knowingly engaged in conduct through a pattern of racketeering activity to receive income derived, directly and indirectly, from a pattern of racketeering activity in which they have participated as a principal within the meaning of

section 2, title 18, of the United States Code, to use and invest, directly and indirectly part or all of such income, or the proceeds of such income, in acquisition of any interest in, or establishment or operation of, any enterprise which is engaged in, or activities of which effect, interstate or foreign commerce in violation of 18 U.S.C. § 1962 (a).

101.    Said pattern of racketeering activity included, among others, the following predicate acts:

(a)    as part of a scheme or artifice to defraud the Company, multiple acts of money laundering in violation of 18 U.S.C. § 1341 by means of using the Company to fraudulently obtain payment from the public for the Company services through the use of software which was involuntarily imbedded in consumer's computer and then transferring those funds to other entities in an attempt to promote the carrying on the Company's various viral marketing schemes and to conceal the source and origin of the proceeds of this fraudulent software scheme, including:

(i)    Utilizing "adware" or "spyware" software to fraudulently obtain over 6 million dollars from customers in an attempt to bolster income of the Company when, in fact, none of the funds obtained were through voluntary usage of the Company services.

(ii)    Paying funds totaling approximately $9,000,000 to companies he operated or controlled by defendants to provide "traffic", where the traffic was the result of utilizing the software previously embedded in consumers' computers during the Subscriber Scheme.  This conduct had the two fold benefit of giving Quan an artificial meteoric rise in interest in his company as well as permitting

him to steal money from the Company by shifting funds to companies he operated or controlled.

      (iii)    In reaching the website unique visitor benchmarks set for the "Earn Out Shares", Quan was able to improperly obtain millions of shares in the corporation which provided him a control and almost a majority of the shares of the Company.

    (b)    as part of a scheme or artifice to defraud the Company, multiple acts of fraud in the sale of securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 by means of improperly inflating and falsifying the interest in the Company by the public, including:

      (i)    Utilizing "adware" or "spyware" software to register false hits on the Company web site to manufacture false public interest in the Company, i.e. the Unique Visitor Scheme.

      (ii)    Utilizing "adware" or "spyware" software to fraudulently obtain funds from customers in an attempt to bolster income, which would then be diverted from the Company, when, in fact, none of the funds obtained were through voluntary usage of the Company services, i.e. the Subscriber Scheme.

      (iii)    Paying funds totaling approximately $9,000,000 to companies operated or controlled by defendants to provide "traffic" which the hits on the web site were alleged to be a result of utilizing the software previously embedded in consumers' computers during the Subscriber Scheme actions. This conduct had the two fold benefit of giving defendants, specifically Quan, an artificial

meteoric rise in interest in his company as well as permitting them to steal money from the Company by shifting funds to a company they operated or controlled.

(iv)    In reaching the website hit benchmarks set for the "Earn Out Shares", Quan was able to improperly obtain millions of shares in the corporation which provided him with control and almost a majority of shares of the Company.

(c)    as part of a scheme or artifice to defraud the Company, multiple acts of mail fraud in violation of 18 U.S.C. § 1341 by means of utilizing the United State Postal Service to improperly loot corporate assets and to inflate and falsify the interest in the Company by the public in order to obtain the "Earn Out Shares" and to increase the overall value of the Company stock, including:

(i)    Mailing all shareholders, directors and officers, as well as various governmental agencies, copies of the 8-K, 10-Q, and 10-K reports through utilization of the United State Postal Service which defendants knew to contain false and misleading information and statement in furtherance of and in attempts to conceal their racketeering conduct; including the such mailings on or about February 15, 2007, May 21, 2007, October 15, 2007, November 14, 2007, and December 19, 2007.

(d)    as part of a scheme or artifice to defraud the Company, multiple acts of wire fraud in violation of 18 U.S.C. § 1343 by means of utilizing the internet to improperly obtaining funds through the Subscriber Scheme to inflate and falsify the interest in the Company by the public in order to obtain the "Earn Out Shares" and to increase the overall value of the Company stock and obtain millions of additional shares, including:

       (i)     Utilizing "adware" or "spyware" software to register false hits on the Company web site in an attempt to falsely inflate the public interest in the Company to improperly drive up stock prices and reach benchmarks set for the issuance of Earn Out Shares to Quan.

       (ii)    Issued knowingly false and misleading press releases over the internet on the overall condition of the company in an attempt to falsely inflate the public interest in the Company to improperly drive up stock prices and reach benchmarks set for the issuance of Earn Out Shares to Quan including the February 27, 2007 press release titled "Broadcaster Traffic Rankings Soar in U.S. and Global Markets." That press release claims that the traffic recorded on the Broadcaster web site "shows a growing awareness of our website by users of online entertainment" when, in fact, practically no public interest at all existed for the Broadcaster.com web site. Similar false and misleading press releases were issued on February 6 and 12, 2007.

       (iii)   Posting to all shareholders, directors and officers, as well as various governmental agencies, copies of the 8-K, 10-Q, and 10-K reports through electronic means which defendants knew to contain false and misleading information and statement in furtherance of and in attempts to conceal their racketeering conduct; including the such mailings on or about February 15, 2007, May 21, 2007, October 15, 2007, November 14, 2007, and December 19, 2007.

102.    Defendants' activities alleged above were repeated and continuous, and posed a significant threat of continued criminal activity.

103.    By means of the foregoing, Quan acquired and/or maintained an interest in or

control of the Company.

104.    By reason of the foregoing, and as a direct and proximate result of defendants'
maintenance and control of the Company as set forth above, the Company was injured and is
entitled to a money judgment in amount to be determined at trial but not less than $22,630,000,
plus interest, trebled damages in excess of $67,890,000.00, along with reasonable attorney's fees
and costs.

## NINTH CAUSE OF ACTION

### PURSUANT TO 18 U.S.C. SECTIONS 1962(b) AND 1964 (c) AS AGAINST NOLAN QUAN (SECOND RICO CAUSE OF ACTION)

105.    Plaintiff incorporates by reference and realleges each and every allegation set
forth above as if fully set forth herein.

106.    At all times relevant, Plaintiff, and the Enterprises were enterprises engaged in
interstate commerce.

107.    Upon information and belief, Quan unlawfully, willfully and knowingly engaged
in conduct through a pattern of racketeering activity acquire and maintain, directly or indirectly,
any interest in or control of the Company in violation of 18 U.S.C. § 1962 (b).

108.    Upon information and belief, said pattern of racketeering activity included, among
others, the following predicate acts:

(a)    as part of a scheme or artifice to defraud the Company, multiple acts of
fraud in the sale of securities in violation of 17 CFR § 240.10b-5 by means of improperly
inflating and falsifying the interest in the Company by the public in order to reach
benchmarks set to obtain the "Earn Out Shares" which totaled millions of shares to gain
further control of the Company, including:

(i)      Utilizing "adware" or "spyware" software to register false hits on the Company web site.

(ii)     Paying funds totaling approximately $9,000,000 to companies he operated or controlled to provide "traffic" which the hits on the web site were alleged to be a result of, however, the companies paid for this "traffic" took no action at all and Quan simply utilized the software previously embedded in consumers' computers during the scheme which led to the 2006 FTC action. This conduct had the two fold benefit of giving Quan a justification for the meteoric rise in interest in his company as well as permitting him to steal money from the Company by shifting funds to a company he operated or controlled.

(iii)    In reaching the benchmarks set for the "Earn Out Shares", Quan was able to improperly obtain millions of shares in the corporation which he then used to vote to oust the two Directors of the Company which were inquiring into the missing Company assets.

(b)      as part of a scheme or artifice to defraud the Company, multiple acts of mail fraud in violation of 18 U.S.C. § 1341 by means of utilizing the United State Postal Service to improperly inflate and falsify the interest in the Company by the public in order to increase the overall value of the Company stock, including:

(i)      Mailing all shareholders, directors and officers, as well as various governmental agencies, copies of the 8-K, 10-Q, and 10-K reports through utilization of the United State Postal Service which defendants knew to contain false and misleading information and statement in furtherance of and in attempts to conceal their racketeering conduct; including the such mailings on or about

- 34 -

February 15, 2007, May 21, 2007, October 15, 2007, November 14, 2007, and December 19, 2007.

(c)    as part of a scheme or artifice to defraud the Company, multiple acts of wire fraud in violation of 18 U.S.C. § 1343 by means of utilizing the internet to improperly inflate and falsify the interest in the Company by the public in order to increase the overall value of the Company stock, including:

(i)    Utilizing "adware" or "spyware" software to register false hits on the Company web site in an attempt to falsely inflate the public interest in the Company to improperly drive up stock prices and reach benchmarks set for the issuance of "Earn Out Shares" to him.

(ii)    Issued knowingly false and misleading press releases over the internet on the overall condition of the company in an attempt to falsely inflate the public interest in the Company to improperly drive up stock prices and reach benchmarks set for the issuance of "Earn Out Shares" to him including the February 27, 2007 press release titled "Broadcaster Traffic Rankings Soar in U.S. and Global Markets." That press release claims that the traffic recorded on the Broadcaster web site "shows a growing awareness of our website by users of online entertainment" when in fact, practically no public interest at all existed for the Broadcaster.com web site. Similar false and misleading press releases were issued on February 6 and 12, 2007.

(iii)    Posting to all shareholders, directors and officers, as well as various governmental agencies, copies of the 8-K, 10-Q, and 10-K reports through electronic means which defendants knew to contain false and misleading

information and statement in furtherance of and in attempts to conceal their racketeering conduct; including the such mailings on or about February 15, 2007, May 21, 2007, October 15, 2007, November 14, 2007, and December 19, 2007.

109.    Defendants' activities alleged above were repeated and continuous, and posed a significant threat of continued criminal activity.

110.    By means of the foregoing, Quan acquired and/or maintained an interest in or control of the Company.

111.    By reason of the foregoing, and as a direct and proximate result of Quan's maintenance and control of the Company as set forth above, the Company was injured and is entitled to a money judgment in amount to be determined at trial but not less than $22,630,000, plus interest, trebled damages in excess of $67,890,000.00, along with reasonable attorney's fees and costs.

## TENTH CAUSE OF ACTION

### PURSUANT TO 18 U.S.C. SECTIONS 1962(c) AND 1964 (c) AS AGAINST ALL DEFENDANTS (THIRD RICO CAUSE OF ACTION)

112.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

113.    At all times relevant, Defendants were an enterprise engaged in interstate commerce.

114.    Upon information and belief, defendants unlawfully, willfully and knowingly engaged in, or the activities of which affect, interstate or foreign commerce, to conduct and participate, directly and indirectly, in the conduct of the Enterprises' affairs through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962 (c).

115.    Upon information and belief, said pattern of racketeering activity included, among others, the following predicate acts:

(a)    as part of a scheme or artifice to defraud the Company, multiple acts of wire fraud as set forth in 18 U.S.C § 1961 (1)(A) in violation of 18 U.S.C. § 1343 by means of offering money payments to individuals who assisted in Quan's theft of Company funds, including:

(i)    Utilizing "adware" or "spyware" software to register false hits on the Company web site in an attempt to falsely inflate the public interest in the Company to improperly drive up stock prices and reach benchmarks set for the issuance of "Earn Out Shares" to Quan in order to obtain and maintain control of the Company.

(ii)    Issued knowingly false and misleading press releases over the internet on the overall condition of the company in an attempt to falsely inflate the public interest in the Company to improperly drive up stock prices and reach benchmarks set for the issuance of Earn Out Shares to him including the February 27, 2007 press release titled "Broadcaster Traffic Rankings Soar in U.S. and Global Markets." That press release claims that the traffic recorded on the Broadcaster web site "shows a growing awareness of our website by users of online entertainment" when, in fact, practically no public interest at all existed for the Broadcaster.com web site. Similar false and misleading press releases were issued on February 6 and 12, 2007.

(iii)    Posting to all shareholders, directors and officers, as well as various governmental agencies, copies of the 8-K, 10-Q, and 10-K reports through

- 37 -

electronic means which defendants knew to contain false and misleading information and statement in furtherance of and in attempts to conceal their racketeering conduct; including the such mailings on or about February 15, 2007, May 21, 2007, October 15, 2007, November 14, 2007, and December 19, 2007.

(b)     as part of a scheme or artifice to defraud the Company, defendants engaged in multiple acts of fraud in the sale of securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, including, without limitation:

(i)     Utilizing "adware" or "spyware" software to register false hits on the Company web site.

(ii)     Paying funds totaling approximately $9,000,000 to companies he operated or controlled to provide "traffic" which the hits on the web site were alleged to be a result of, however, the companies paid for this "traffic" took no action at all and defendants simply utilized the software previously embedded in consumers' computers during the scheme which led to the 2006 FTC action. This conduct had the two fold benefit of giving defendants a justification for the meteoric rise in interest in the Company as well as permitting defendants to steal money from the Company by shifting funds to a company they operated or controlled.

(iii)     In reaching the benchmarks set for the "Earn Out Shares", Quan was able to improperly obtain millions of shares in the corporation which he is attempting to utilize to vote to oust the two Directors of the Company which were inquiring into the missing Company assets.

(c)    as part of a scheme or artifice to defraud the Company, defendants engaged in multiple acts of mail fraud in violation of 18 U.S.C. § 1343, including, without limitation:

(i)    Mailing all shareholders, directors and officers, as well as various governmental agencies, copies of the 8-K, 10-Q, and 10-K reports through utilization of the United State Postal Service which defendants knew to contain false and misleading information and statement in furtherance of and in attempts to conceal their racketeering conduct; including the such mailings on or about February 15, 2007, May 21, 2007, October 15, 2007, November 14, 2007, and December 19, 2007.

(d)    Defendants' activities alleged above were repeated and continuous, and posed a significant threat of continued criminal activity.

116.    By means of the foregoing, defendants acquired and/or maintained an interest in or control of the Company.

117.    By reason of the foregoing, and as a direct and proximate result of Quan's maintenance and control of the Company as set forth above, the Company was injured and is entitled to a money judgment in amount to be determined at trial but not less than $22,630,000, plus interest, trebled damages in excess of $67,890,000.00, along with reasonable attorney's fees and costs.

## ELEVENTH CAUSE OF ACTION

### PURSUANT TO 18 U.S.C. SECTIONS 1962(d) AND 1964 (c) AS AGAINST ALL DEFENDANTS (FOURTH RICO CAUSE OF ACTION)

118.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

119.    Upon information and belief, by their conduct described above, defendants did conspire to, and did in fact, unlawfully, willfully and knowingly engaged in conduct through a pattern of racketeering activity to receive income derived, directly and indirectly, from a pattern of racketeering activity in which they have participated as a principal within the meaning of section 2, title 18, of the United States Code, to use and invest, directly and indirectly part or all of such income, or the proceeds of such income, in acquisition of any interest in, or establishment or operation of, any enterprise which is engaged in, or activities of which effect, interstate or foreign commerce in violation of 18 U.S.C. § 1962 (a), engaged in conduct through a pattern of racketeering activity acquire and maintain, directly or indirectly, any interest in or control of the Company in violation of 18 U.S.C. §§ 1962 (b) and engaged in, or the activities of which affect, interstate or foreign commerce, to conduct and participate, directly and indirectly, in the conduct of the Enterprises' affairs through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962 (c), which constitute a violation of 18 U.S.C. §§ 1962 (d).

120.    By reason of the foregoing, and as a direct and proximate result of defendants' maintenance and control of the Company as set forth above, the Company was injured and is entitled to a money judgment in amount to be determined at trial but not less than $22,630,000, plus interest, trebled damages in excess of $67,890,000.00, along with reasonable attorney's fees and costs.

**WHEREFORE, Plaintiff demands judgment as follows:**

(a)    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, self-dealing, conversion, violations of the law, violations of securities law and unjust enrichment in an amount to be established at trial but not less than $22,630,000;

(b)    Equitable and/or injunctive relief as permitted by law, equity and statutory provisions, including, declaring the improper share transfers complained of herein of millions of shares to Quan, to be null and void; attaching, impounding, and imposing a constructive trust on or otherwise restricting the shares and the proceeds of defendants' trading activities and other activities complained of herein; and enjoining the defendants from participating in authorizing, approving, aiding, abetting or facilitating in any way further conduct with respect to the continuation of the practices complained of herein;

(c)    Awarding to the Company restitution from the Defendants, jointly and severally, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants as a result of the conduct alleged herein in an amount to be established at trial but not less than $22,630,000;

(d)    Appointment of a receiver to direct corporate functions and prevent any further harm, waste or injury to Plaintiff.

(e)    On the eighth cause of action, a money judgment against Defendants in an amount to be determined at trial, but not less than $22,630,000, plus interest, treble damages in excess of $67,890,000, along with reasonable attorney's fees and costs pursuant to 18 U.S.C. § 1964(c), and divestiture of any interest in the Company or any property or money acquired through the RICO enterprise pursuant to 18 U.S.C. § 1964(a);

(f)    On the ninth cause of action, a money judgment against Quan in an amount to be determined at trial, but not less than $22,630,000, plus interest, treble damages in excess of $67,890,000.00, along with reasonable attorney's fees and costs pursuant to 18 U.S.C. § 1964(c), and divestiture of any interest in the Company or any property or money acquired through the RICO enterprise pursuant to 18 U.S.C. § 1964(a);

- 41 -

(g)    On the tenth cause of action, a money judgment against Quan, jointly and severally, in an amount to be determined at trial, but not less than $22,630,000, plus interest, treble damages in excess of $67,890,000, along with reasonable attorney's fees and costs pursuant to 18 U.S.C. § 1964(c), and divestiture of any interest in the Company or any property or money acquired through the RICO enterprise pursuant to 18 U.S.C. § 1964(a);

(h)    On the eleventh cause of action, a money judgment against Quan, jointly and severally, in an amount to be determined at trial, but not less than $22,630,000, plus interest, treble damages in excess of $67,890,000, along with reasonable attorney's fees and costs pursuant to 18 U.S.C. § 1964(c), and divestiture of any interest in the Company or any property or money acquired through the RICO enterprise pursuant to 18 U.S.C. § 1964(a); and

(i)    Interest on all said sums, together with the costs and disbursements of this action, including reasonable attorney's fees, accountants' and experts' fees, costs and expenses and such other and further relief as to the Court seems just and proper.

Dated: New York, New York
     February 15, 2008

By: _____
    Steven R. Montgomery (SM 4514)
    SULLIVAN GARDNER PC
    Attorneys for Plaintiff
    475 Park Avenue South
    New York, New York 10016
    (212) 687-5900

## Verification

I, Michael Gardner, on behalf of Baytree Capital Associates, LLC, states the following to be true under the penalties of perjury:

1.      I am a member of Baytree Capital Associates, LLC, the plaintiff in this matter, derivatively on behalf of Broadcaster, Inc.  I am familiar with the facts and proceedings in this lawsuit as they pertain to this Complaint.

2.      I have read the foregoing Verified Shareholder Derivative Complaint and know or believe its contents to be true, except as to matters alleged upon information and belief, which matters I believe to be true upon information and belief as stated.

3.      I base this verification on my review of the pleading and other documents and conversations with certain persons related to Plaintiff.

Dated: New York, New York
       February 15, 2008

Michael Gardner
Baytree Capital Associates, LLC